UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS – EASTERN DIVISION

| | |
|---|---|
| IVO GEIJSEN,<br><br>                         Plaintiff,<br><br>     v.<br><br>DANTE ODONI, RANIM BARGHOUTY and COLDWELL BANKER RESIDENTIAL REAL ESTATE LLC, a California limited liability company,<br><br>                         Defendants. | No. 20-cv-02837 |

**REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

NOW COMES Plaintiff Ivo Geijsen ("Plaintiff"), by and through his attorney, Scott M. Levin, and replies in support of his motion for summary judgment motion, stating as follows:

**INTRODUCTION**

Defendants Dante Odoni and Ranim Barghouty's ("Defendants") Response in Opposition to Plaintiff's Motion for Summary Judgment ("Response") goes far beyond the two affirmative defenses they raised in their Answer to the Complaint, attempting to introduce new matters which may or may not constitute defenses. In addition, their Statement of Additional Facts alleges many facts which are disputed. More important, virtually all of their additional facts, and one fact Defendants erroneously state was admitted by Plaintiff[1], are irrelevant to the determination of Plaintiff's Motion for Summary Judgment. In fact, most of the additional facts are not even

---

[1] Defendants state they requested an extension of the closing date and that Plaintiff refused, citing to Plaintiff's Uncontested Fact ¶20. (Response, p.2) This is one of many misleading statements on Defendants' part. Plaintiff only admitted that Defendants *requested* an extension. (Plaintiff's Admitted Fact 19) As Defendants well know, Plaintiff offered to extend the closing date from September 5, 2020 until March 31, 2021, but that was not good enough for Defendants; they wanted to close in in December 2021. (See attached **Exhibit A**) Of course, any request to extend the closing date is irrelevant.

1

referenced in the Response. For that reason, Plaintiff will not undertake a refutation of facts that are either irrelevant or not incorporated into the Response.

The one thing apparent in the Response is that Defendants are desperately trying to find *something* to excuse them from performing their very straightforward obligations under the Contract: if they chose not to close, they agreed to pay Plaintiff a liquidated damage equal to 9% of the purchase price, being $243,000. Neither affirmative defense is valid nor offers any relief to Defendants.

## DEFENDANTS' PERFORMANCE WAS NOT EXCUSED

Defendants do not contest the validity of the Contract; instead they rely solely on two affirmative defenses to attempt to defeat Plaintiff's claim. Their First Affirmative Defense is the doctrine of impossibility or impracticability. (First Affirmative Defense, ¶24) They allege as their Second Affirmative Defense that pursuant to the Uniform Vendor and Purchaser Risk Act (the "Uniform Act") the risks of loss prior to closing are to be borne by Plaintiff as seller. (Second Affirmative Defense, ¶28) In their Response, Defendants attempt to improperly insert another doctrine, being commercial frustration, and then completely fail to address the Uniform Act.

## FIRST AFFIRMATIVE DEFENSE
## DOCTRINE OF IMPOSSIBILITY/IMPRACTICABILITY

The doctrines of impossibility and impracticability (hereinafter the "Doctrine") are closely related and the terms are often used interchangeably. The caselaw cited by Plaintiff clearly holds that under the Doctrine: (a) impossibility of performance is limited to the destruction of the means of performance by an act of God; (b) performance of contract will only be excused under the Doctrine when it is objectively impossible; and (c) the Doctrine has been narrowly applied, due in part to judicial recognition that the purpose of contract law is to allocate the risks that might affect

2

performance and that performance should be excused only in extreme circumstances. *YPI v.180 N. LaSalle Owner, LLC*, 403 Ill.App.3d at 6; 933 N.E.2d 864.

Several cases cited by Plaintiff are directly on point for the proposition that a real estate purchaser's inability to get financing is not an "impossibility" under the Doctrine. Two cases cited by Plaintiff are not only directly on point, they are virtually factually identical in that they concern real estate buyers who unsuccessfully sought to be excused from performance due to their inability to obtain financing for unanticipated reasons beyond their control (one being the Great Recession of 2008). In all of Plaintiff's cited cases, the courts found the Doctrine did not offer relief. They held that the Doctrine must be narrowly applied to excuse performance only in extreme circumstances, and only where performance is "objectively impossible." (Memorandum, pp. 3-4)

Defendants' Response simply ignores every case cited by Plaintiff. Defendants argue they could not obtain financing, but disregard the clear law that an inability to obtain financing does not equate to "impossibility" under the Doctrine. In particular, Defendants ignore case law that expressly held that financing is a "risk that can be readily guarded against by inclusion in the contract of financing contingency provisions." (Memorandum, pp. 4-5) Defendants did not include any such financing contingency. Moreover, "the existence or non-existence of employment by one of the buyers ... will not excuse performance of the contract under the doctrine of impossibility." (*See*, Memorandum, p. 5)

Remarkably, Defendants did not cite a single Illinois case in support of their arguments regarding the Doctrine. There are citations to treatises, such as the Restatement (Second) Contracts (1981) and *Williston on Contracts*, but then only for general propositions not related in any way to the facts of this case. The only citations to actual caselaw are two decisions from the Tennessee

Appellate Court, even though Illinois law is undisputedly applicable, and neither Tennessee case involves financing for a real estate contract.

The treatises cited by Defendants actually help explain why the Doctrine is unavailable to them. Under *YPI v.180 N. LaSalle*, and other cases cited by Plaintiff, performance of contract will only be excused under the doctrine when it is *objectively* impossible:

> "It is generally well settled that subjective impossibility, that is, impossibility which is personal to the promisor and does not inhere in the nature of the act to be performed, does not excuse nonperformance of the contractual obligation. Subjective impossibility or personal inability to perform one's contractual promise ordinarily is to be distinguished from objective impossibility of performance. The distinction, as explained by Williston, is between 'the thing cannot be done' (this being called objective impossibility) and 'I cannot do it,' called subjective impossibility."

C.T. Foster, "Annotation, Modern Status of the Rules Regarding Impossibility of Performance as Defense in Action for Breach of Contract," 84 A.L.R.2d 12, 29-30 (1962) (quoting Williston, *Contracts* (Rev. ed.) §1932).

The facts alleged by Defendants, even if true, would allege a personal inability to perform, *i.e.*, a subjective impossibility, and not that "the thing cannot be done," *i.e.*, an objective impossibility.

## DOCTRINE OF COMMERCIAL FRUSTRATION

It is questionable whether Defendants have properly pled this affirmative defense. They only mention "frustration of purpose" in a single sentence at the end of the Second Affirmative Defense, which is based on the Uniform Vendor and Purchaser Risk Act. In reality, it makes little difference because the Illinois Court of Appeals has recognized the doctrine of "commercial frustration" or "commercial impracticability" as an extension of the contract defense of impossibility of performance. *Greenlee Foundries, Inc. v. Kussel*, 13 Ill.App.3d 611, 615, 301 N.E.2d 106, 109 (1st Dist. 1973).

4

The Response misleadingly, or at least incorrectly, cites three elements for proving frustration of purpose. (Response, p. 4) Since no legal authority is provided, these elements must be disregarded.

Under Illinois law, there are two key elements: (1) the party met a frustrating event not reasonably foreseeable, and (2) the value of counter-performance has been totally or nearly totally destroyed by the frustrating event. *Smith v. Roberts*, 54 Ill.App.3d 910, 912, 370 N.E.2d 271, 273 (4th Dist. 1977). As noted by Plaintiff in his Memorandum, on the first element, the question is not whether the pandemic was foreseeable, but rather "whether it was foreseeable that a lender might not provide [the purchaser] with financing in connection with the purchase of the ... property. The foreseeability of that event is beyond debate." (Memorandum, p. 5, citing *Ner Tamid Congregation of N. Town v. Krivoruchko*, 638 F. Supp. 2d at 928)

Defendants neither cite the second element nor offer any evidence that the value of the subject condominium has been "totally or nearly totally destroyed." They merely state that some of the building amenities have been suspended.

The doctrine of commercial frustration is not to be liberally applied. *Smith v. Roberts*, 54 Ill.App.3d at 913, 370 N.E.2d T 273; *American National Bank v. Richoz*, 189 Ill.App.3d 775, 780, 545 N.E.2d 550, 554 (2nd Dist. 1989). Defendants have not even come close. The foreseeability of the frustrating circumstance and the ability of a defendant to overcome it are questions of law to be resolved by the court. *Northern Illinois Gas Co. v. Energy Cooperative, Inc.*, 122 Ill.App.3d 940,952, 461 N.E.2d 1049, 1059 (3rd Dist. 1984). The resolution of this point, therefore, is appropriate for summary judgment.

## SECOND AFFIRMATIVE DEFENSE
## UNIFORM VENDOR AND PURCHASER RISK ACT

As stated in Plaintiff's Memorandum, the Uniform Act expressly provides that the purchasers are only relieved of their obligations if "all or a material part [of the property] is destroyed," or "is taken by eminent domain." Plaintiff was unable to find any authority under either Illinois law or the law of any other state that relieved a purchaser under the Uniform Act for anything other than these two reasons.

Defendants have not alleged any damage to the condominium unit. They also have not alleged, much less offered evidence, that Trump Tower or a material part of it has been destroyed. Defendants are only able to state that Trump Tower suspended or discontinued "maintenance and building amenities." (Response, pp. 3, ¶¶2,4)[2] That hardly equates to destruction of a property.

Continuing to grasp at straws, Defendants have inserted a contract defense that was not alleged as an affirmative defense and must be disregarded. They point to Paragraph O of the General Provisions of the Contract, which provides in part that "Seller agrees to provide possession of the Property in the same condition as it is on the acceptance date." For the purposes of the Contract, however, "Property" is defined to mean "401 N. Wabash, #68E Chicago, IL 60611," being the condominium unit, not Trump Tower. Defendants make no allegations whatsoever regarding the condition of the unit.

## LIQUIDATED DAMAGES

Defendants did not raise the calculation of damages as an affirmative defense, and Plaintiff suggests it is improper to do so in response to the summary judgment motion. To the extent this Court deems it appropriate, however, Plaintiff replies on the issue.

---

[2] In his declaration, Odoni only states that "many," not all, of them were discontinued. (Odoni Dec., ¶12)

At the start of Defendants' argument, it appears that they do not dispute that the payment of earnest money is a proper damage when a buyer defaults under a residential real estate contract. They only assert that they "did not assume the risk of a pandemic," and that the $243,000 payment would be unconscionable and an "improper windfall" to Plaintiff. (Response, p. 5) But, later in their response, Defendants state, "Nowhere does the contract does *[sic]* it use the term liquidated damages and the July 22, 2019 letter did not state the additional payment would be deemed liquidated damages." (Response, p. 9)

To the extent Defendants question whether there was an agreement for liquidated damages, "it has been long established in Illinois that the provision for earnest money in a contract, in the absence of an express provision to the contrary, will be interpreted as a provision for liquidated damages and enforced without actual proof of damages being required." *Bamberg v. Griffin*, 76 Ill. App. 3d 138, 144, 394 N.E.2d 910, 914 (1st Dist. 1979); *Berggren v. Hill*, 401 Ill. App. 3d 475, 479, 928 N.E.2d 1225, 1229 (1st Dist. 2010).

In *Berggren*, the court considered a residential real estate contract that had the same General Provision E to the Contract in this matter, except the language of payment to first pay the broker's commissions and expenses had been deleted. The buyer defaulted and the seller was awarded the earnest money as a liquidated damage. The defaulting buyer took the position that there was no liquidated damage clause and that actual damages had to be determined. The court held the language in General Provision E constituted was to be construed as a liquidated damages clause. *Id.*

There is no "windfall" to Plaintiff. If Plaintiff recovered his actual damage, it would be based on a good faith sale to a subsequent purchaser, which, in view of Defendants' expressed pandemic concerns, could very well be at a price that is less than $243,000 below the price Plaintiff

agreed to sell to Defendants. In addition, Plaintiff will have been delayed many months on the closing. The very purpose of Contract General Provision E. is to liquidate the damage to Plaintiff as the amount of the Earnest Money. (Doc. # 1-1, p. 4) If Defendants did not want that provision, they were free to negotiate it. In fact, Defendants do not dispute the liquidated damage, they merely asserted that it is $135,000, instead of $243,000. (Response, p. 8) There is no basis for Defendants' conclusory assertion that they did not assume the risk of the pandemic; it was their risk.

Pursuant to the Contract, Buyers agreed to deposit with Defendant Coldwell Banker Residential Real Estate LLC ("Escrowee") $135,000 in initial earnest money (the "Initial Earnest Money"), which Defendants have paid. (Odoni Decl., ¶9) The Earnest Money was to be increased to 9% of the Purchase Price, *i.e.*, $243,000, on or before March 20, 2020 (the "Final Earnest Money"). (Answer, ¶8) Pursuant to Contract General Provision E., "[i]n the event of a default by Buyer, the Earnest Money, less expenses and commissions of the listing broker, shall be paid to Seller." (Answer, ¶12)

The Modification to the Contract states:

..., in the event of Buyers' default prior to the deposit of the full 9% earnest money, the Buyers' obligation to deposit the full 9% earnest money will remain intact; otherwise Seller shall retain all rights and remedies at law or in equity and in the event of litigation the non-prevailing party shall be responsible for payment in full of any all costs of the prevailing party, including , but not limited to reasonable attorney's fees and court costs. (Hereinafter, "Paragraph 3")

(July 22, 2019 letter attached as Exhibit B to Complaint)

The parties' obligations under these facts are quite clear. First, pursuant to General Provision E, the Earnest Money on deposit with Escrowee is to be paid to Seller. Second, Defendants/Buyers defaulted prior to the deposit of the full 9% earnest money, but their obligation to pay the full 9%, *i.e.*, $243,000, remains and they are responsible to pay Plaintiff the difference.

Defendants note the rule of construction that ambiguities should be construed against the drafter. There must, however, first be must be an ambiguity, and even then, the rule of construction is not definitive. There is nothing ambiguous about Paragraph 3: "the Buyers' obligation to deposit the full 9% earnest money will remain intact."

In a further attempt to defeat the clear provisions of the Contract, Defendants, after correctly stating Paragraph 3, misquote it, stating: "The provision states if the additional funds are not to be paid, *the Seller shall retain all rights at law or in equity.*" (emphasis in Response, p. 9, ¶3) The <u>actual</u> language of Paragraph 3, which explains that the Earnest Money is to be paid to Seller, states "in the event of Buyers' default prior to the deposit of the full 9% earnest money, the Buyers' obligation to deposit the full 9% earnest money will remain intact; <u>otherwise</u> Seller shall retain all rights and remedies at law or in equity." *(emphasis added)* In other words, Paragraph 3 clarifies that the liquidated damage in General Provision E is not limited to the amount of the Initial Earnest Money, and that if the Final Earnest Money has not yet been deposited, Buyers' obligation to deposit the Final Earnest Money remains intact. Moreover, "liquidated damages clauses do not limit a non-defaulting party's remedies, but instead provide an agreed upon measure of damages." *Siegel v. Levy Org. Dev. Co.*, 182 Ill. App. 3d 859, 861, 538 N.E.2d 715, 716 (1989)

It is important to remember that "Earnest Money," as used in General Provision E is defined in Paragraph 4 of the Contract as "the Initial and Final Earnest Money" together. And, if Defendants failed to deposit the Final Earnest Money, then Plaintiff was entitled to bring an action "at law or in equity" to both seek payment from the Escrowee of the Initial Earnest Money and a judgment against Defendants for the Final Earnest Money if it had not yet been deposited.

A court "will not interpret a contract in a manner that would nullify or render provisions of it meaningless, or in a way that is contrary to the plain and obvious meaning of the language

9

employed. *ESP Glob., LLC v. Nw. Cmty. Hosp.*, 2020 IL App (1st) 182023, ¶21. It must be presumed "that each contractual provision was inserted deliberately and for a purpose consistent with the parties' intent, and if possible [the court] must interpret a contract in a manner that gives effect to all of the contract's provisions." *Kasper v. McGill Mgmt. Inc.*, 2019 IL App (1st) 181204, ¶39, 130 N.E.3d 15, 25.

Without Paragraph 3, there might be an ambiguity as to whether Earnest Money included Final Earnest Money in a situation where Defendants defaulted before they paid it to the Escrowee. Under Defendants' interpretation, Paragraph 3 would be meaningless. Paragraph 3 can only serve to clarify General Provision E by making it clear that Defendants remain liable to Plaintiff for the Final Earnest Money. There would be no other purpose for including Paragraph 3.

Finally, Defendants take the position that Plaintiff is not entitled to liquidated damages because he "has not provided any evidence of [his] actual damages." (Response, p. 10) The very nature of liquidated damages is that they are appropriate "in instances where damages are difficult to ascertain. *Siegel v. Levy Org. Dev. Co.*, 182 Ill. App. 3d 859, 861, 538 N.E.2d 715, 716 (1989). Plaintiff is not required to either alleger of prove actual damages. Indeed, that would be inappropriate. "If the non-defaulting party chooses to reject the liquidated damages clause, he does not have the right to seek a greater measure of damages than the amount bargained for." *Id.*

There is nothing ambiguous about the language and construction of General Provision E and Paragraph 3. In the event this Court disagrees, it would be inappropriate to rule in Defendants' favor as they have no motion for summary judgment pending.

WHEREFORE, Plaintiff Ivo Geijsen respectfully moves this Court to grant his motion for summary judgment.

                              IVO GEIJSEN

                              /s/ Scott M. Levin
                              One of his attorneys

Scott M. Levin – ARDC #6185743
Howard & Howard Attorneys PLLC
200 S. Michigan Avenue, Suite 1100
Chicago, IL 60604-2461
(312) 456-3418
*slevin@howardandhoward.com*

4849-6025-1335, v. 1

**<u>EXHIBIT A TO</u>**
**<u>REPLY IN SUPPORT OF PLAINTIFF'S</u>**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

| | |
|---|---|
| **From:** | jeffrey gutman <jkg4018@gmail.com> |
| **Sent:** | Monday, April 27, 2020 3:16 PM |
| **To:** | Scott M. Levin; Dante A Odoni |
| **Subject:** | Odono and Barghouty/Geijsen- 401 N. Wabash #68E, Chicago, IL |

**CAUTION: EXTERNAL EMAIL**

Dear Scott:

I get the impression that you or your client do not fully understand the situation. My client wants to purchase the unit and is willing to deposit the additional $108,000 in earnest money, provided that the Seller grant an extension to close until 12/2021. We even offered your client the ability to sell the unit earlier with Mr. Odoni being granted a right of first refusal.

The following is a further explanation of the difficulties that exist as a result to the Covid-19 pandemic and the resulting government shutdown:

1- The Amount of down payment to secure a reasonable loan terms must be at least 20%. Based on the contract amount of $2.7 million the down payment needs to be $540,000 plus closing costs of at least another 40,000 which will bring the amount needed to $580,000.

2- Due to the coronavirus, big portion of my client business accounts receivable has stopped and good portion of it may not be collectible. In addition the revenues have dropped and terms of payments have been extended.

3- Provided the economy's slow down and the uncertainty, and in order for my client to stay in business, he is unable to exhaust the limited cash that is needed to stay afloat and he needs to keep some liquidity for the next 6 months to 1 year.

4- Banks have stiffened their loan requirements due to the Coronavirus and it appears that it will be almost impossible to get a loan in the near future. My client has talked to few banks that he has a relationship with and they indicated so.

5- Based on the future expectations, it appears that there will be a recession and drop in the real estate value in this year, which will add to the burden of getting a loan. The drop in value will require my client to pay the difference between the contract price and the value of the apartment in addition to the 20% down payment.

For the above reasons, my client will need at least until end of next year to be able to remedy the effect of the Coronavirus to become in a position to comfortably secure a loan.

The terms the seller has demanded are not acceptable. We cannot agree to pay any increase in rent until December 2021 (if agreed). The unit was offered for rent at $12,000 per month and the rental market for high rise condominiums will not be increasing anytime soon. If we can't reach an agreement, my client. will exit the unit once the law permits and it is safe and reasonable.


Jeff

--
Jeffrey K. Gutman
Attorney at Law
Gutman & Associates LLC
4018 N. Lincoln Ave.
Chicago, IL 60618
Tel. 773-472-4500
Fax 773-472-2430

*******************************************************************************
STATEMENT OF CONFIDENTIALITY This Electronic Message, including attachments, contains information from the law firm of Gutman and Associates, LLC which may be confidential and privileged. The information is intended to be for the use of the addressee(s) only. If you are not an addressee, note that any disclosure, copy, distribution or use of the contents of this message is prohibited. If you have received this electronic message in error, please reply to the sender and delete the message from your computer.
*******************************************************************************

| | |
|---|---|
| **From:** | Scott M. Levin |
| **Sent:** | Friday, May 1, 2020 5:17 PM |
| **To:** | jeffrey gutman |
| **Cc:** | Leo G. Aubel |
| **Subject:** | Odono and Barghouty/Geijsen- 401 N. Wabash #68E, Chicago, IL - FINAL DEMAND |

Jeff,

I have had several conversations with Seller, who has been quite frustrated with the lack of negotiation on the part of Buyers. Maybe a better result could have been achieved for them if they had, but that time has passed. Seller is ready to file a federal lawsuit. I asked for his final position in advance of litigation. He authorized the following two options presented not for negotiation, but for Buyers to either accept or reject. If they reject both of them, then there is no need for further discussion.

Scott


Contract Extension

1. Buyers agree that: (a) the earnest money is a liquidated damage if they fail to purchase, and (b) their performance under the contract is not subject to any defenses, now or in the future, related to coronavirus, such as those raised in your initial email, e.g., force majeure, doctrines of impossibility, frustration of purpose or impracticability. If Buyers default and do not either close or agree to the payment of the earnest money to Seller, they will be responsible for all of Seller's attorneys fees from April 1, 2020, the date Howard & Howard was retained to address Buyer refusal to close.

2. Seller will extend closing until **March 31, 2021**.

3. The earnest money under the contract will increase to **16%**, the balance of which will be deposited directly.

4. Rent on the condo will increase to **$13,500** per month, effective September 1, 2020.


Contract Termination

   1. Buyers deposit 70% of the remaining earnest money due, i.e., $75,600, bringing the total earnest money to $210,600, to be retained by Seller as liquidated damages.

   2. The contract is terminated.

   3. Rent on the condo will increase to $13,000 per month effective May 1, 2020.

   4. Lease is extended to expire at the end of the second month after State shelter in place order terminates, or at either parties' option on 60 days' notice on any date on or after September 30, 2020, whichever is sooner.

   5. Buyers fully cooperate with showings to prospective buyers of condo.